[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13690
_____

D.C. Docket No. 9:16-cv-81795-KAM

ENGINEERED TAX SERVICES, INC.,
a Florida corporation,

Plaintiff - Appellant,

versus

SCARPELLO CONSULTING, INC.,
a Nebraska corporation,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 14, 2020)

Before NEWSOM, TJOFLAT, and GINSBURG,[*] Circuit Judges.

NEWSOM, Circuit Judge:

Stripped of its high-tech veneer, this is a pretty straightforward trademark-infringement case. Engineered Tax Services (ETS) has accused Scarpello Consulting of using its name to steal business. Although the details may seem complicated because the alleged infringement occurred as part of an internet advertisement placed with the world's leading search engine, Google, the technological minutiae don't much matter to the resolution of this appeal.

What really matters here is the validity of ETS's service mark in its name. The district court concluded that no reasonable jury could find "Engineered Tax Services" to be a valid mark. It held, on summary judgment and as a matter of law, that the mark lacks the requisite "distinctiveness"—in the lingo, that the mark was not "inherently distinctive" and had not "acquired distinctiveness" over time. Because we think that a jury could reasonably find the mark distinctive—in particular, inherently distinctive—we reverse and remand for further proceedings.

---

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the District of Columbia Circuit, sitting by designation.

**I**

**A**

As is typical in trademark disputes, ETS and Scarpello are in the same line of business.  Both provide specialized tax services—in particular, (1) cost segregation and (2) Section 179D and Section 45L energy studies.  Cost segregation is a tax-planning method by which an owner of real property breaks down a piece of real estate into constituent pieces of personal property for accounting purposes so as to allow for faster depreciation.  The accelerated accounting of losses results in a lower tax burden.  Cost segregation is often, but by no means always, performed by (or with the involvement of) licensed engineers. Section 179D and Section 45L energy studies calculate tax deductions or credits for building energy-efficient buildings.[1]  These energy studies must be conducted by (or with the involvement of) licensed engineers or contractors.

Between late 2013 and early 2014, ETS briefly entered into negotiations to purchase Scarpello, or perhaps to engage Scarpello as a subcontractor, but no agreement was reached, and the parties went their separate ways.  About a month after negotiations broke down, Scarpello began a Google AdWords marketing

---

[1] Section 179D of the Internal Revenue Code allows owners of commercial buildings to take a tax deduction equal to the cost of making certain energy-efficient improvements to their properties.  26 U.S.C. § 179D.  Section 45L provides a $1,000 or $2,000 tax credit for building new residential buildings that meet certain energy-efficiency standards.  *Id*. § 45L.

campaign using "engineered tax services"—among other terms—as a keyword. [2] In an AdWords campaign, an advertiser pays Google to display its website as the first result when a user performs a search using one of the advertiser's handpicked keywords. During Scarpello's campaign, therefore, Googling "engineered tax services" returned Scarpello's website as the first result. ETS's site—an unsponsored search result—appeared second.

For a time—and as part of the same AdWords campaign—Scarpello also provided Google marketing copy bearing the title "Engineered Tax Services." As a result, that phrase not only served as a keyword—to bump Scarpello's website to the top of the list—but also appeared as the text of a hyperlink to Scarpello's site. Because ETS was also using the phrase "Engineered Tax Services" as a title and hyperlink, when a user Googled "engineered tax services," the first two links both appeared as "Engineered Tax Services," but the first connected to Scarpello's website rather than ETS's. Legal or not, it's easy to see why Scarpello's tactics concerned ETS once it eventually discovered the campaign.

In October 2015, ETS filed an application with the United States Patent and Trademark Office (PTO) to register the service mark "Engineered Tax Services,"

---

[2] Scarpello points out that "engineered tax services" was just one keyword out of more than 200 keywords in its campaign. Fair point, but undercut by the fact—explained in text immediately below—that Scarpello ultimately incorporated the same phrase into its advertising copy, thereby showing that it had a special status among the numerous keywords.

which it had been using continuously since 2006.  The PTO registered the mark in June of the following year.  In doing so, the PTO didn't require, and ETS didn't present, any evidence that the mark had taken on any "secondary meaning" as an identifier of the source of a good or service—which would have been necessary to registration on "acquired distinctiveness" grounds.  What that means—as we have recently had occasion to clarify, and as we explain in greater detail below—is that the PTO is presumed to have registered ETS's mark on the ground that it is "inherently" distinctive.  *Royal Palm Properties, LLC v. Pink Palm Properties, LLC*, 950 F.3d 776, 784 (11th Cir. 2020) ("'If no proof of secondary meaning [was] provided' as part of the registration process, the 'presumption is that [the] mark is inherently distinctive.'" (alterations in original) (quoting *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 n.3 (11th Cir. 2007))).

By May 2016 at the latest, about a month before obtaining registration of its "Engineered Tax Services" mark, ETS discovered that Scarpello had been using the mark in the AdWords campaign.  A few months later, armed with its newly registered mark, ETS filed the lawsuit that underlies this appeal.

**B**

As relevant here, ETS's suit featured a claim for infringement of its "Engineered Tax Services" mark under the Lanham Act.[3]  Scarpello responded not only by denying that it had infringed ETS's mark, but also by arguing that the mark was invalid because it lacked the requisite distinctiveness.[4]  Ruling on cross-motions for summary judgment, the district court held, as a matter of law, that no reasonable jury could have found ETS's mark distinctive—either inherently or by virtue of having acquired a distinctive secondary meaning.  Having determined the mark to be invalid, the court granted summary judgment for Scarpello without reaching any remaining aspect of the infringement inquiry.[5]

**II**

"A plaintiff seeking to prevail on a trademark infringement claim must show 1) that he had a valid trademark and 2) that the defendant had adopted an identical or similar mark such that consumers were likely to confuse the two." *Gift of*

---

[3] ETS also brought several other Lanham Act claims, as well as state-law claims alleging deceptive trade practices, trespass, and unjust enrichment.

[4] Scarpello separately petitioned the PTO to cancel ETS's mark; that proceeding has been stayed pending the outcome of this litigation.

[5] The court also granted summary judgment for Scarpello on all of its other Lanham Act claims as well as its state-law claim for deceptive trade practices, all of which depend on the existence of a valid mark.  The court then declined to exercise supplemental jurisdiction over the remaining state-law claims, dismissing them without prejudice.  All of these claims will need to be considered on remand in light of our holding, explained below, that the mark does not lack distinctiveness as a matter of law.

*Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797 (11th Cir. 2003).  Because

the district court granted summary judgment to Scarpello on the ground that ETS's

service mark was invalid at step one, so to speak, we too reach only the question of

the mark's validity.[6]  To be valid, a trademark must be "distinctive"—that is, it

must "serve the purpose of identifying the *source* of . . . goods or services," not

just the goods and services themselves.  *Welding Servs.*, 509 F.3d at 1357

(emphasis added).  "[A] mark can be 'distinctive' in one of two ways: It can be

'inherently' distinctive, or it can 'acquire' distinctiveness over time."  *Royal Palm*,

950 F.3d at 782.  Whether a mark has either inherent or acquired distinctiveness is

a question of fact.  *Welding Servs.*, 509 F.3d at 1357.  Because a valid mark need

only have *either* inherent *or* acquired distinctiveness, we must reverse the district

court's judgment here if we find a genuine dispute that "Engineered Tax Services"

is distinctive in either respect.  We conclude that a reasonable jury could find

ETS's mark to be inherently distinctive, so we needn't reach the question of

acquired distinctiveness.

---

[6] "We review a district court's grant of summary judgment de novo," *Browning v. AT&T Paradyne*, 120 F.3d 222, 224 (11th Cir. 1997), "applying the same standards that should have been applied by the district court," *Hiram Walker & Sons, Inc. v. Kirk Line*, 877 F.2d 1508, 1513 (11th Cir. 1989), and "view[ing] the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1282 (11th Cir. 2003) (alteration in original) (quoting *Burton v. City of Belle Glade,* 178 F.3d 1175, 1186–87 (11th Cir.1999)).

Distinctiveness is a function of what we have called a mark's "strength." "[W]e have classified marks into four categories, in descending order of strength: (1) 'fanciful' or 'arbitrary,' (2) 'suggestive,' (3) 'descriptive,' and (4) 'generic.'" *Royal Palm*, 950 F.3d at 783. "[F]anciful marks (think 'Verizon' telecommunications—the name is a made-up word), arbitrary marks (think 'Apple' computers—the name is a real word that has nothing to do with the product) and suggestive marks (think 'Igloo' coolers—the name is a real word that bears only an oblique relationship to the product)" are all inherently distinctive. *Id.* A "descriptive mark[] (for example, an eyeglasses store called 'Vision Center')," by contrast, is *not* inherently distinctive and can "become protectible only if [it] 'acquire[s]' distinctiveness by obtaining a 'secondary meaning'" as an identifier of a product's source in the minds of the public. *Id.* "[G]eneric marks (a book-selling company called 'Books') . . . can never become protectible." *Id.*

The dispute here arises at the hazy border between suggestive and descriptive marks. There is little doubt that ETS's mark falls into one of these two categories; ETS insists that its mark is suggestive—it doesn't even contend that the mark is fanciful or arbitrary—while Scarpello primarily argues that the mark is merely descriptive.[7] Because, as just explained, the line separating suggestive

---

[7] Scarpello conclusorily asserts that the mark might be generic. It never explains that position, though, nor does it explain what kind of service could be referred to generically as "Engineered

8

from descriptive marks is also the line separating marks with inherent distinctiveness from those without, that line—and determining on which side "Engineered Tax Services" falls—makes all the difference to this appeal.

All agree that Scarpello—as the summary judgment movant here and the party challenging the mark's validity—bears the burden to *disprove* inherent distinctiveness. Registration with the PTO entitles a mark's holder to a presumption of either inherent or acquired distinctiveness, depending on the ground on which registration was obtained. *See Royal Palm*, 950 F.3d at 784. As already explained, when ETS registered "Engineered Tax Services," it wasn't required to—and didn't—provide evidence of any acquired secondary meaning. Accordingly, and as a result of the PTO's registration, the mark is presumed to be inherently distinctive and thus at least suggestive. *Royal Palm*, 950 F.3d at 784. The upshot is that in defending its mark's validity against Scarpello's attack, ETS "had no burden to come forward with any affirmative evidence" that its mark was inherently distinctive; "to the contrary, [Scarpello] had the burden to prove otherwise." *Id.* at 785.[8]

_____

Tax Services." We don't see how ETS's mark could be considered generic, and we won't address this contention in any detail.

[8] A split in authority exists as to the strength of the presumption of validity. Charles L. Cook & Theodore H. Davis Jr., *Litigating the Meaning of "Prima Facie Evidence" Under the Lanham Act: The Fog and Art of War*, 103 Trademark Rep. 437, 444–55 (2013). Some courts have imposed a mere burden of production, which dissipates as soon as a challenger makes a prima facie case of invalidity, shifting the burden of persuasion back to the mark holder to prove validity by a preponderance of the evidence. *Id.* at 448–55. But most courts have treated the

Moreover, Scarpello bears something of a double burden here as a result of the case's procedural posture—we are here on appeal from a grant of summary judgment in Scarpello's favor.  As the party seeking summary judgment on a factual issue with respect to which it bears the burden of proof, Scarpello had to present evidence so decisive that "no reasonable jury could find" for ETS. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quotation omitted).  Reviewing de novo, then, we can affirm the district court's summary judgment for Scarpello only if "no reasonable jury could find that it failed to meet its burden." *Royal Palm*, 950 F.3d at 786 (applying this double burden in the context of a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b)).

For the reasons that follow, we conclude that Scarpello hasn't cleared this high hurdle.

*         *         *

Two legal tests—we'll call them the "imagination" test and the "third-party-use" test—work in tandem to distinguish suggestive from descriptive marks.  We will consider them—and the district court's application of them—in turn.

---

presumption as a burden of persuasion, requiring the challenger to prove invalidity by a preponderance of the evidence. *Id.* at 444–48.  In *Royal Palm* we adopted the majority position, at least implicitly, *see* 950 F.3d at 786, and we explicitly reaffirm that position here.

10

## A

A mark is merely descriptive, rather than suggestive—and thus is *not* inherently distinctive—if "the customer who observes the term can readily perceive the nature of plaintiff's services, *without having to exercise his imagination.*" *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1524 (11th Cir. 1991) (emphasis added). Applying the imagination test, the district court here concluded that "[b]ecause it is commonly understood that the utilization of a licensed engineer is a well-accepted approach to cost segregation and tax energy studies, and the mark describes that aspect of the services, the mark is merely descriptive." The district court supported its decision primarily with dictionary definitions of the mark's constituent terms. The court's analysis missed the mark for two reasons. First, the court focused too narrowly on the individual meanings of individual words—and in particular, the verb form of the word "engineer"—to the exclusion of the mark as a whole. Second, the court considered only one sense of the word "engineer[]," to the exclusion of other relevant meanings.

The district court focused its distinctiveness analysis almost exclusively on the verb form of the word "engineer"—considering the phrase "tax services" only briefly—and never addressed the effect of combining the terms "engineered" and "tax services." But as we have explained elsewhere, the whole can indeed be

11

greater than the sum of its parts—"ordinary words can be combined in a novel or unique way and thereby achieve a degree of protection denied to the words when used separately." *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 116 (5th Cir. 1979). Here, the fact that the undeniably descriptive term "tax services" was modified by the adjective "engineered" is particularly significant because tax services aren't the sort of thing that ordinarily calls for engineering. Inferring the nature of ETS's services from its mark, therefore, is more likely to require imagination than would a more natural pairing of words. Consider two hypothetical alternatives: an accounting firm that performs cost segregation and calls itself "Skillful Tax Services" and a biotech startup that cultures genetically modified bacteria and calls itself "Engineered Genes." There, the connections between product and mark are easy to draw because the combinations are natural—unlike, we think, "Engineered Tax Services," the meaning of which is not (or is certainly less) immediately apparent.

The district court's failure to analyze the mark holistically likely compounded (and was compounded by) its second error—an unjustifiably narrow focus on a single dictionary definition of the verb "engineer." Citing the *Random House College Dictionary* and *Webster's II New Riverside Dictionary*, the district court considered only one definition—and not even of the verbal adjective "engineered," but of the verb "engineer." That term, the court said, meant "[t]o

12

plan and manage as an engineer."  In light of this definition—and because ETS employs some actual engineers—the district court determined that the phrase "Engineered Tax Services" simply described tax services performed by engineers.

ETS contends—and we agree—that there's more to it than that.  The verbal-adjective "engineered" can, of course, denote something created or produced by (or with the involvement of) actual engineers—but it can also mean, as ETS's definitions show, "[s]killfully and deliberately arranged rather than arising naturally or spontaneously," or "designed and built using scientific principles." Reply Br. of Appellant at 5 (citing *Lexico: Powered by Oxford* and *Cambridge Dictionary*).[9]  The district court failed to consider the possibility that the term "engineered" can be understood, in the context of the mark "Engineered Tax Services," both to indicate the involvement of actual engineers and to communicate precision and technical skill.

---

[9] Looking to other, more traditionally authoritative dictionaries reinforces our conclusion that the district court failed to account for the full range of the ordinary meaning of the verb "engineer" and its verbal adjective "engineered."  The *Oxford* and *Webster's* dictionaries contain equivalents of both the district court's and ETS's preferred definitions.  *See engineer, v.*, Oxford English Dictionary, www.oed.com/view/Entry/62226 (last visited May 13, 2020) (alternatively defining the verb "engineer" as "[t]o work as an engineer" and as "[t]o use specialized knowledge or skills to develop (a complicated system or process) so as to fulfil specified criteria or perform particular functions" and "to arrange, contrive, or plan, esp. artfully"); *Webster's Third New International Dictionary Unabridged* 752 (1961) (alternatively defining the verb "engineer" as "to act as an engineer in the laying out, construction, or management of" and as "to contrive or plan out, usu. with more or less subtle skill or craft").  *See also engineered, adj.*, Oxford English Dictionary, https://oed.com/view/Entry/274138 (last visited May 13, 2020) (defining the verbal adjective "engineered" as "[t]hat has been engineered (*in various senses of the verb*)" (emphasis added)).

Considering the mark "Engineered Tax Services" as a whole, and properly accounting for the range of meanings that the term "engineered" can convey, we think it clear that ETS's mark requires the necessary imaginative leap—or, at the very least, that a reasonable jury could so conclude.[10]  Indeed, what makes ETS's mark at least plausibly imaginative—and thus suggestive, and thus inherently distinctive—is that the term "engineered" can be understood two ways, and that when combined with the phrase "tax services" to form the mark, "Engineered Tax Services" entails a clever double meaning, referring to tax services that are performed *both* (1) skillfully and scientifically *and* (2) by actual engineers.  A potential customer could—without any imagination—understand the mark to communicate *either* the involvement of actual engineers *or* a skillful and scientific approach to providing tax services.  But to grasp both simultaneously requires (or so a reasonable jury could conclude) at least a measure of imagination.  And that is sufficient.[11]

---

[10] To be clear, only a small imaginative leap is necessary to make a mark suggestive.  ETS cites to an illustrative list of marks, compiled by a respected trademark scholar, that courts have held to be suggestive. 2 *McCarthy on Trademarks and Unfair Competition* § 11:72 (5th ed.).  The examples are telling.  To highlight just a few, hardly any imagination is required to infer the service provided by "Dial-A-Mattress," or the function of the product marked "Spray 'n Vac." *Id.*  In another illuminating example, we have held that a jury could reasonably have found LaserSpecialist.com to be suggestive—rather than merely descriptive—of oculoplastic surgery. *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1208 (11th Cir. 2009).

[11] That a double meaning can render a mark suggestive, and thus inherently distinctive, is hardly a new idea.  Both federal courts and the PTO's Trademark Trial and Appeals Board have long recognized as much. *See Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 700 (2d Cir. 1961) (holding that the mark "Poly Pitcher" was inherently distinctive because it referred

In short, we hold that a reasonable jury could find (1) that ETS's mark carries a double meaning, (2) that an imaginative leap is necessary to grasp that double meaning, and (3) accordingly, that the mark is suggestive, and thus inherently distinctive.

## B

Alongside the "imagination" test, courts considering whether a mark is truly suggestive—or instead, merely descriptive—ask "whether competitors would be likely to need the terms used in the trademark in describing their products." *Vision Ctr.*, 596 F.2d at 116 (quoting *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 379 (7th Cir. 1976)); *see also Investacorp*, 931 F.2d at 1523 (holding that "third party usage by competitors is probative" of whether a trademark is

---

both to the product's polyethylene material and to Molly Pitcher, a semi-mythological figure of the American Revolution); *In Re Nat'l Tea Co.*, 144 U.S.P.Q. (BNA) ¶ 286 (T.T.A.B. Jan. 22, 1965) (holding that the mark "NO BONES ABOUT IT" was not merely descriptive of a boneless ham). The TTAB has recently sent mixed messages regarding the precise circumstances under which a double meaning can sustain a determination of suggestiveness. *Compare, e.g.*, *In Re Paul Leonhardt*, 109 U.S.P.Q.2d 2091 (T.T.A.B. 2008) (holding that the mark BOBBLE POPS was merely descriptive and stating that a mark with a double meaning should be deemed suggestive only "if one of its meanings is not merely descriptive in relation to the involved goods or services"), *with, e.g.*, *In Re Tea & Sympathy, Inc.*, 88 U.S.P.Q.2d 1062 (T.T.A.B. 2008) (holding that the mark "THE FARMACY" is suggestive on account of its double meaning, and not merely descriptive of "retail store services featuring natural herbs and organic products"); *In Re Michael W. Arlen*, No. 85135800, 2012 WL 2024457, at *1 (T.T.A.B. May 25, 2012) (holding that the marks "INSTANT NEWTRITION" and "NEWTRITIOUS" are suggestive on account of their double meanings, and not merely descriptive of a "powdered nutritional supplement drink mix"). In any event, the TTAB's decisions do not bind us, and—as we understand matters—the relevant inquiry is not whether grasping one meaning or the other in isolation requires an imaginative leap, but rather whether grasping the double meaning itself requires imagination.

descriptive).  If a competitor "need[s]" the mark to describe its own product, the reasoning goes, it must not be distinctive of the mark holder's product. *Investacorp*, 931 F.2d at 1523.

But the evidence of third-party use here—or more accurately, third party "need"—isn't very compelling.  Scarpello provided only two examples in which other entities have made descriptive use of the exact phrase "engineered tax services," and neither unambiguously refers to cost segregation.  The first is a printout of online marketing copy describing an energy-efficient heating system.  In it, the seller advertises that its "Total Heat System" can help customers qualify for tax deductions—presumably under Section 179D—"[w]ith the involvement of an independent engineered tax services firm."  Although the copy uses the phrase "engineered tax services" to describe services that ETS provides, the fact that the purveyor of the "Total Heat System" clearly isn't one of ETS's competitors undermines the evidence's probative value.  The second example is also marketing copy taken from the internet, but the evidence in the record before us doesn't clearly reveal what the copy is attempting to describe by using ETS's mark.  In a couple of sparse paragraphs, a firm called "RB Engineering" boasts a range of services—"structural engineering, forensic engineering and engineered tax

16

services"—but without any meaningful explanation of what those services entail.[12]

Scarpello's remaining examples don't even contain the entire registered phrase.

Two firms used the term "engineered cost segregation." Another uses

"engineering tax services," and another "engineered tax programs"—both

describing services including cost segregation. A final example boasts an

"engineering approach" to "cost segregation studies."

Although this evidence indicates that competitors have made some limited

descriptive use of the mark—or at least aspects of it—it doesn't demonstrate, as

Scarpello must, that competitors "would be likely to *need* the terms used in

[ETS's] trademark in describing their products." *Vision Ctr.*, 596 F.2d at 116

(emphasis added) (quotation omitted).[13] Scarpello didn't put into evidence a single

example in which the entire phrase "engineered tax services" is used

unambiguously to refer to a product or service in ETS's main line of business. As

---

[12] Venturing outside the record to view other corners of RB Engineering's website, the district court concluded that the firm actually does provide cost-segregation and Section 179D studies. Because Scarpello hasn't put that evidence before us, we needn't consider it, but we hasten to add that even if we did, it wouldn't clearly show that no reasonable jury could conclude that ETS's competitors don't actually "need" to use the phrase "engineered tax services" to describe their businesses.

[13] Scarpello asserts that "ETS provided no evidence to substantiate its claims that these third parties are not in the same industry as ETS." Br. of Appellee at 27. That is both wrong and irrelevant. It is wrong because in at least one instance, it is clear from the face of the evidence that the third-party *is* in a different line of business. It is irrelevant because ETS doesn't bear any burden of proof. Scarpello bears the burden of proving that ETS's registered mark is merely descriptive. Thus, to the extent that the record is silent about the industry in which Scarpello's comparators participate, Scarpello bears the cost.

17

to the other examples, few are close enough to the words that constitute ETS's mark to carry much relevance, and the few that are similar—"engineering tax services" and "engineered tax programs"—are meager evidence that any competitor *needs* to use derivatives of the mark to describe services similar to ETS's. And remember, Scarpello must do more than just convince *us* that its competitors need to use the mark descriptively; it must demonstrate that *no reasonable jury* could conclude otherwise.

In fact, the variety of phrases that third parties use to describe cost segregation and related services cuts against Scarpello. Scarpello's own handpicked examples demonstrate the many ways to describe cost segregation and energy studies *without* using the precise phrase "engineered tax services." Furthermore, they demonstrate that "cost segregation" is by far the most common way to describe services like ETS's; that phrase occurs more often in Scarpello's examples than all variations of "engineered tax services." With such a well-established alternative available, ETS's mark can hardly be "need[ed]" for competitors in that field. Finally, and perhaps most tellingly, Scarpello never used the term "engineered tax services" to market its business—until it launched the Google AdWords campaign that is the subject of this suit. All told, this evidence doesn't even convince us that third parties need to make descriptive use of the

18

words that constitute ETS's mark—let alone convince us that no reasonable jury could find the evidence wanting.

*    *    *

Neither the imagination test nor the third-party-use test can justify summary judgment here, especially considering the presumption of inherent distinctiveness that ETS's mark enjoys by virtue of its registration.  We therefore reverse the district court's holding that ETS's mark lacked distinctiveness as a matter of law.[14]

## III

To summarize, "Engineered Tax Services" can reasonably be understood to entail a double meaning—to suggest tax services that are performed both (1) skillfully and scientifically and (2) by actual engineers.  Against that backdrop, a reasonable jury could conclude that potential customers would need to make at least some imaginative leap to grasp that the mark communicates both attributes. That leap is sufficient to render the mark suggestive, and thus inherently distinctive.  Moreover, none of the evidence of third-party use here would require a

---

[14] We reject Scarpello's assertion that ETS admitted that its mark is merely descriptive.  When the district court asked in open court if the mark was "generic, descriptive, or arbitrary," ETS's attorney answered "descriptive."  The mark is obviously neither generic nor arbitrary; it seems clear to us that ETS's lawyer just chose the least wrong of three wrong answers offered to him. Perhaps ETS's attorney can be faulted for not having the presence of mind to correct the court, but his on-his-feet response hardly constitutes a binding admission that the mark is not suggestive.

reasonable jury to conclude that ETS's competitors actually "need" to use the mark to describe their own services.

The district court therefore erred in concluding, as a matter of law, that ETS's mark was not suggestive, but merely descriptive—and thus invalid. For that reason—and without considering whether the mark might also have acquired any protectible secondary meaning or whether any actionable infringement occurred—we reverse the grant of summary judgment and remand for proceedings consistent with this decision.

**REVERSED** and **REMANDED**.