**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-12653

————————————————

U.S. ALL STAR FEDERATION, INC.,

*Plaintiff-Counter Defendant- Appellant,*

VARSITY SPIRIT, LLC

*Counter Defendant,*

*versus*

OPEN CHEER & DANCE CHAMPIONSHIP SERIES, LLC,
  d.b.a Allstar Worlds Championship/Allstar Worlds,
THE OPEN CHEER AND DANCE, LLC,
  d.b.a. Allstar Worlds Championship/Allstar Worlds,
DAVID OWENS,
HEIDI WEBER,
JEB HARRIS,
DAVID HANBERY,

*Defendants-Counter Claimant-Appellees.*

———————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-02135-WWB-DCI

———————————

Before JORDAN and MARCUS, Circuit Judges, and JONES,[*] District Judge.

MARCUS, Circuit Judge:

This case features a spirited battle of trademarks tied to the sport of competitive international cheerleading. The combatants are two cheerleading organizations, fighting over the validity of a set of contested marks: "THE CHEERLEADING WORLDS" and "WORLDS." The former mark is published on the Supplemental Register by the U.S. Patent and Trademark Office ("PTO"); the latter is an unregistered mark claimed under common law.

U.S. All Star Federation, Inc. ("USASF") launched the first volley, suing Open Cheer & Dance Championship Series, LLC and The Open Cheer and Dance, LLC (the "Open Cheer Entities"), along with their owners and operators (collectively "Open Cheer"), in the Middle District of Florida, claiming that Open Cheer infringed on both marks by hosting a competing cheerleading tournament, known as the "Allstar World Championship" or "Allstar Worlds." In the end, however, Open Cheer took the field. The district court rejected all of USASF's trademark infringement

---

[*] Honorable Steve C. Jones, United States District Judge for the Northern District of Georgia, sitting by designation.

claims, granting summary judgment for Open Cheer. It concluded that the two cheerleading marks were generic as a matter of law, and therefore insufficiently distinctive to receive any protection under state or federal law.

We disagree. Although the district court was right to review on the merits whether the marks are distinctive, since that issue was not foreclosed by the earlier dismissal of USASF's affirmative defenses, a review of the considerable body of evidence presented by USASF on the usage of the two marks has convinced us that there are critical fact questions in dispute -- including whether the marks are descriptive and have acquired secondary meaning -- that cannot be resolved at summary judgment. On the record before us, a reasonable jury could find that USASF's two marks are sufficiently distinctive to warrant trademark protection.

Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

## I.

USASF is a sanctioning organization that governs and organizes events for "All Star" cheerleading and dance, a competitive form of coordinated cheerleading where athletes represent private clubs and gyms instead of a given sports team or school. Since 2004, in conjunction with the International All Star Federation ("IASF") and the International Cheer Union ("ICU"), USASF has conducted an annual, week-long event at Disney World in Orlando, Florida known as "Championship Week," which has two component competitions: "The Cheerleading Worlds" and "The

Dance Worlds." "The Cheerleading Worlds," or simply "Worlds," is a season-end championship hosting the highest-level All Star teams from the United States and around the world. During the regular season, teams compete to earn "bids" based on their "level"; USASF's event features athletes in three distinct levels (5, 6, and 7).

USASF claims it holds two valid trademarks in connection with its annual competition: (1) THE CHEERLEADING WORLDS and (2) WORLDS. As for the first of these marks, USASF owns a federal registration on the Supplemental Register (Registration No. 2,999,331). USASF also asserts that due to its "long-standing and substantially exclusive use of the marks," as well as "the significant goodwill it has built up in these marks over the past 20 years," it possesses a common law right to both marks. USASF has filed two applications with the PTO for publication on the Principal Register for THE CHEERLEADING WORLDS and THE CHEERLEADING WORLDS (design), which remain pending.

David Owens, Heidi Weber, Jeb Harris, and David Hanbery (the "Individual Appellees"), formerly members of USASF, are the sole owners of the Open Cheer Entities. Starting in 2020, Open Cheer began promoting a different season-end All Star cheerleading competition, known as the "Allstar World Championship" or "Allstar Worlds." The competition caters to "younger athletes in levels 1 through 5 but not level[s] 6 or 7." Allstar Worlds is conducted around the same time as USASF's Championship Week,

and is held nearby, at the Orange County Convention Center in Orlando, Florida. USASF claims that since its launch, Allstar Worlds has "resulted in significant confusion in the marketplace," because athletes, parents, reporters, and other competition-goers have confused Allstar Worlds with The Cheerleading Worlds.

On December 21, 2021, USASF fired a shot across the bow, commencing this lawsuit against Open Cheer in the Middle District of Florida. USASF sought to enjoin the alleged infringement of its marks, recover damages, disgorge unlawfully obtained profits, and procure treble and punitive damages. In defense of its marks, USASF brought five claims: (1) infringement of USASF's federal trademark, THE CHEERLEADING WORLDS, under the Lanham Act, 15 U.S.C. § 1114(1)(a); (2) infringement of USASF's common law trademarks, WORLDS and THE CHEERLEADING WORLDS, under the Lanham Act, *id.* § 1125(a); (3) infringement of USASF's common law trademarks, WORLDS and THE CHEERLEADING WORLDS, under Florida common law; (4) unfair competition under Florida common law; and (5) civil conspiracy under Florida common law.

Open Cheer returned fire on April 4, 2022, denying the factual predicates of USASF's claim -- and in particular, that USASF's marks "are well-known and have acquired distinctiveness among its membership and among the All Star cheer and dance community more broadly." Open Cheer's Answer also asserted affirmative defenses against the marks' distinctiveness, including one that stated: "Plaintiff's claims are barred, in whole or in part, because

Plaintiff's alleged marks are merely descriptive, lack secondary meaning, and/or are generic."

USASF moved to strike several of Open Cheer's affirmative defenses under Federal Rule of Civil Procedure 12(f). Of note, the motion challenged the affirmative defense on the distinctiveness of USASF's marks, claiming it was conclusory and legally insufficient. On August 29, 2023, the parties jointly moved to dismiss the affirmative defenses identified in the motion to strike, including the one claiming USASF's marks were generic. The district court granted the motion, dismissing the defenses with prejudice.

Thereafter, Open Cheer moved for summary judgment. It claimed that (1) USASF did not have a valid and protectable trademark, because the two marks were generic, or were descriptive without secondary meaning; (2) the assignment agreement which gave USASF initial ownership of the two marks was unenforceable; (3) USASF could not show its marks were unlawfully used; and (4) there was no likelihood of confusion between USASF's marks and Open Cheer's marks. In response, USASF argued, among other things, that Open Cheer was barred from raising the matter of distinctiveness at summary judgment, since the earlier order dismissing Open Cheer's affirmative defenses was entered with prejudice, precluding all further litigation of the issue.

The district court granted summary judgment on all counts in favor of Open Cheer. First, the court held that the assignment of the marks to USASF was valid and granted USASF standing to sue, a holding which neither side now challenges. The court then

reached the pivotal question of distinctiveness, explaining that Open Cheer was not precluded from raising the matter on summary judgment, because "distinctiveness, or non-genericness, is an essential element of Plaintiff's case on which Plaintiff bears the burden of proof," meaning "Defendants were not required to raise genericness as an affirmative defense in this case."

On the merits, the court found that the two marks were not sufficiently distinctive to merit any legal protection. The court examined many dictionary definitions of "cheerleading" and "world" and concluded that the marks, which were comprised of these words, were not suggestive. It went on to find that the marks were generic, since they described the "basic nature of the service" USASF offers. Critically, the court determined that although "Plaintiff does point to some evidence showing non-generic use of the Cheerleading Marks," this evidence "f[ell] short of creating a genuine dispute of material fact," since USASF's event was supposedly the only season-ending cheerleading championship in All Star cheerleading at the time, thereby explaining away any public association between the contested marks and USASF's event.

This timely appeal followed. USASF challenges the district court's ruling on three grounds: first, that Open Cheer ought to have been barred from addressing the marks' distinctiveness at summary judgment, because the dismissal with prejudice of Open Cheer's affirmative defense effectively operated as a judgment on the merits of the issue; second, that the court erred in weighing evidence on the factual question of distinctiveness, and employed

the wrong genericness standard; and, finally, that the court's conclusion that USASF's two marks were generic was in error, since the record evidence is sufficient to establish a genuine dispute of fact as to the distinctiveness of the disputed marks, either because the marks are suggestive, or because they are descriptive and have taken on secondary meaning.

## II.

We review a grant of summary judgment de novo, "applying the same legal standards used by the district court." *Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022, 1026 (11th Cir. 2019) (quoting *Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008)). Summary judgment is granted where the proffered evidence "show[s] that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting Fed. R. Civ. P. 56(c)). If "the evidence is merely colorable" or "is not significantly probative," so that no reasonable jury could find in favor of the non-movant, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). "When reviewing a grant of summary judgment, the court of appeals may affirm if there exists any adequate ground for doing so, regardless of whether it is the one on which the district court relied." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993) (citing, *inter alia*, *Davis v. Liberty Mut. Ins. Co.*, 525 F.2d 1204, 1207 (5th Cir. 1976)).

What's more, we have explained that "[s]ummary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir. 2022) (quoting *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967)). Most significantly, at summary judgment, "the judge's function is not himself to weigh the evidence . . . but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A genuine issue of material fact would exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

In making this determination, a reviewing court must examine the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (citation modified). Further, "the district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation modified). "If the record presents factual issues, the Court must not decide them; it must deny the motion [for summary judgment] and proceed to trial." *Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1246 (11th Cir. 1999) (per curiam) (citation modified).

## III.

### A.

As a preliminary matter, USASF contends that the question of distinctiveness was not properly before the district court, since the matter was decided on the merits when Open Cheer agreed to

dismiss the following affirmative defense with prejudice: "Plaintiff's claims are barred, in whole or in part, because Plaintiff's alleged marks are merely descriptive, lack secondary meaning, and/or are generic." Because the phrase "with prejudice" is synonymous with "on the merits," *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990), USASF reasons that the dismissal of this affirmative defense with prejudice operates as an adjudication of the marks' distinctiveness on the merits.

USASF is mistaken. Our Court has never given preclusive effect to the dismissal of an affirmative defense, so that no further defense could be mounted on a prima facie element later in the same case. USASF identifies no such holding, instead only offering the unremarkable observation that a dismissal "with prejudice" functions as an adjudication on the merits where preclusion is otherwise proper. Indeed, in nearly all of the cases USASF cites, preclusion applied because the claim or issue was raised in prior litigation, not in an earlier part of the same proceeding. *See, e.g.*, *Hart v. Yamaha-Parts Distribs., Inc.*, 787 F.2d 1468, 1470 (11th Cir. 1986) (holding that dismissal with prejudice of a prior negligent design action barred claim for breach of warranty); *Citibank*, 904 F.2d at 1500–02 (same for preclusion following a prior settlement agreement).

Only one case in USASF's briefing breaks this pattern. However, USASF's spotlight of *Federal Deposit Insurance Corp. v. Loudermilk*, 930 F.3d 1280 (11th Cir. 2019) further undermines its position. In *Loudermilk*, the plaintiff moved for summary judgment

on one of the defendants' affirmative defenses, prompting that defense to be withdrawn. *Id.* at 1294. At trial, when the defendants sought to introduce evidence related to the defense on the merits, the plaintiff moved to exclude such evidence. *Id.* Although we held that the district court did not abuse its discretion in granting the plaintiff's motion, our reasoning was clear: the district court did so because of an earlier evidentiary ruling that the defendants had not challenged. *Id.* at 1295. The panel in *Loudermilk* never condoned, directly or indirectly, the preclusion of evidence or argument on a prima facie element simply because an affirmative defense on the subject had been dismissed earlier.

To bar the review of a plaintiff's prima facie case on these facts would unduly stretch the boundaries of our precedent on preclusion, reaching even improperly pled affirmative defenses. Affirmative defenses "raise[ ] matters extraneous to the plaintiff's *prima facie* case; as such, they are derived from the common law plea of 'confession and avoidance.'" *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1270 (1st ed. 1969)). So, "[a]n affirmative defense is one that, 'if established, requires judgment for the defendant even if the plaintiff can prove his case by a preponderance of the evidence.'" *Grippa v. Rubin*, 133 F.4th 1186, 1196 (11th Cir. 2025) (quoting *Wright v. Southland Corp.*, 187 F.3d 1287, 1303 (11th Cir. 1999)).

"A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense." *In re Rawson*, 846 F.2d at

1349.  Our Court has long recognized a clear distinction between affirmative defenses of the kind enumerated in Federal Rule of Civil Procedure 8(c)[1] and defenses to the merits of a prima facie case.  *See, e.g.*, *id.*; *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1224 (11th Cir. 2010).  The distinction can have real consequences in litigation, since "[f]ailure to plead an affirmative defense generally results in a waiver" of that claim.  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010).  Defenses pled in this manner are evaluated independently from the merits of a party's prima facie showing.  Thus, for example, outside of the defenses enumerated in Federal Rule 8(c), "[m]any kinds of immunity are routinely pleaded as affirmative defenses."  *Grippa*, 133 F.4th at 1196 (citing *Moore v. Morgan*, 922 F.2d 1553, 1557 (11th Cir. 1991)).

The defense at issue here is plainly not an affirmative defense.  Open Cheer attempted to deny that USASF had established the distinctiveness of its claimed marks.  This denial is not a "matter[ ] extraneous to the plaintiff's prima facie case," *In re Rawson*, 846 F.2d at 1349, nor would it "require[ ] judgment for the

---

[1] Federal Rule of Civil Procedure 8(c) reads in pertinent part:

> *In General*: In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: accord and satisfaction; arbitration and award; assumption of risk; contributory negligence; duress; estoppel; failure of consideration; fraud; illegality; injury by fellow servant; laches; license; payment; release; res judicata; statute of frauds; statute of limitations; and waiver.

FED. R. CIV. P. 8(c)(1) (citation modified).

defendant even if [USASF] can prove [its] case," *Grippa*, 133 F.4th at 1196 (citation modified). Instead, it bears directly on the first element that USASF must prove to obtain relief for a trademark infringement claim. That the defense was dismissed with prejudice, then, should be unsurprising. It was never a proper affirmative defense to begin with, and no amendment by Open Cheer would have cured it of that defect. *See generally Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1162–63 (11th Cir. 2019).

We have previously condemned a "kitchen-sink approach to pleading and affirmative defenses," where a party asserts numerous "affirmative defenses" that are functionally denials in disguise. *Loudermilk*, 930 F.3d at 1295. This approach produces defenses that are duplicative of an answer's general denials and blurs the line between the litigants' respective burdens of proof. But Open Cheer, in apparent recognition of its error, agreed to the dismissal of the offending defense. Open Cheer's Answer also included a proper, general denial of the distinctiveness of USASF's marks. It reads this way: "Defendants deny that Plaintiff's alleged 'WORLDS Trademarks' are well-known and have acquired distinctiveness among its membership and among the All Star cheer and dance community more broadly." Thus, the issue remained very much alive even after the affirmative defense had been dismissed.

"This Court has excused technical noncompliance with pleading requirements where the substance of the pleading is sufficient." *Myers*, 592 F.3d at 1225 (citation modified). Although Open

Cheer's affirmative defense was brought in error, the upshot of dismissing that defense does not vitiate the general denial Open Cheer properly asserted elsewhere in its Answer, nor does the dismissal function as a binding determination on the distinctiveness of the marks. The dismissal was a correction of a technical mishap, bringing Open Cheer's Answer in line with the appropriate pleading standards for denials and affirmative defenses. The district court did not err, therefore, in rejecting USASF's estoppel argument, and in allowing Open Cheer to present evidence on the issue of distinctiveness at summary judgment. On the parties' agreement, the court corrected the pleadings, and held USASF to the burden of proving distinctiveness that had never left USASF's shoulders.

## B.

We turn to the merits. A trademark is "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (quoting 15 U.S.C. § 1127). In Section 32 of the Lanham Act, Congress created a cause of action for infringement of a mark registered on either the Principal or Supplemental Registers. 15 U.S.C. § 1114(1)(a). Section 43, moreover, supplies a cause of action for common law marks that are used in interstate commerce. *Id.* § 1125(a). In either case, a claimed mark must meet certain threshold showings.

Thus, "[a] plaintiff seeking to prevail on a trademark infringement claim must show 1) that he had a valid trademark and

24-12653                Opinion of the Court                15

2) that the defendant had adopted an identical or similar mark such that consumers were likely to confuse the two." *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797 (11th Cir. 2003) (per curiam) (citing, *inter alia*, 15 U.S.C. § 1125(a)). A valid trademark is "distinctive," meaning it "identif[ies] the source of the goods or services," not the goods or services themselves. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007) (citing *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007)).

"[A] mark can be 'distinctive' in one of two ways: It can be 'inherently' distinctive, or it can 'acquire' distinctiveness over time." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782 (11th Cir. 2020) (citing *Welding Servs.*, 509 F.3d at 1357). Inherently distinctive marks facially "identify the source of a particular product or service[.]" *Id.* (citing *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011)). Conversely, a mark that has acquired distinctiveness "might initially have been understood to describe a broad class of potential products or services, but over time it has taken on a 'secondary meaning' that links it to a particular source." *Id.* at 783 (citing *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991)). "Because a valid mark need only have either inherent or acquired distinctiveness," we would be required to reverse the district court's grant of summary judgment if a genuine dispute exists over whether either of the marks, THE CHEERLEADING WORLDS or WORLDS, are "distinctive in either respect." *Engineered Tax Servs., Inc. v. Scarpello Consulting, Inc.*, 958 F.3d 1323, 1327 (11th Cir. 2020).

Our law is clear that "the four categories of distinctiveness in trademark law, listed in descending order of strength, are: (1) fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic." *Knights Armament*, 654 F.3d at 1188 (citing, *inter alia*, *Welding Servs.*, 509 F.3d at 1357; *Custom Mfg. & Eng'g Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 n.8 (11th Cir. 2007)). Although "[t]he demarcation between each category is more blurred than it is definite," over the years we have attempted to shade in the contours of each category. *Coach House Rest.*, 934 F.2d at 1559.

"[F]anciful marks (think 'Verizon' telecommunications -- the name is a made-up word), arbitrary marks (think 'Apple' computers -- the name is a real word that has nothing to do with the product) and suggestive marks (think 'Igloo' coolers -- the name is a real word that bears only an oblique relationship to the product)" are all inherently distinctive. *Royal Palm Props.*, 950 F.3d at 783. Because marks belonging to these categories are inherently distinctive, "no proof of secondary meaning is required for [them] to be protectable." *Knights Armament*, 654 F.3d at 1188 (quoting *Coach House Rest.*, 934 F.2d at 1560).

In contrast, "[a] 'descriptive' mark identifies a characteristic or quality of the product," *id.* (citing *Welding Servs.*, 509 F.3d at 1358), and can "become protectible only if [it] 'acquire[s]' distinctiveness by obtaining a 'secondary meaning'" as an identifier of a product's source in the minds of the consuming public. *Royal Palm Props.*, 950 F.3d at 783 (citation modified). Finally, at the bottom of

the distinctiveness hierarchy, "generic marks . . . can never become protectible." *Id.* (citing *Knights Armament*, 654 F.3d at 1188).

A mark's distinctiveness category is a question of fact. *Welding Servs.*, 509 F.3d at 1357 (citing, *inter alia*, *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1523 (11th Cir. 1991)). At summary judgment, USASF bears the burden to make a prima facie showing that it possesses a valid, distinct trademark, since neither mark is registered on the PTO's Principal Register. All agree that USASF's marks are neither arbitrary nor fanciful. The marks would only be protectible, then, if they are suggestive, or are descriptive with secondary meaning. We conclude that, at this preliminary stage, there is no genuine dispute of material fact over whether the marks are suggestive, but there remain genuine disputes over whether the two marks are descriptive and have obtained secondary meaning.

*i.*

First, WORLDS and THE CHEERLEADING WORLDS are not suggestive. As noted, USASF bears the burden of producing evidence from which a reasonable jury could find that its two marks are suggestive. It has not done so.

Suggestive marks bear only an "oblique relationship to the product" they reference. *Royal Palm Props.*, 950 F.3d at 783. We have traditionally employed two tests to determine whether a mark is suggestive. The first is the so-called "imagination" test, which asks whether a mark "requires a leap of the imagination to get from the mark to the product." *Knights Armament*, 654 F.3d at

1188; *see also Engineered Tax Servs.*, 958 F.3d at 1329. The second is the third-party use test, which we have also called a test of third-party "need." *Engineered Tax Servs.*, 958 F.3d at 1331. It asks "whether competitors would be likely to need the terms used in the trademark in describing their products." *Id.* (quoting *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 116 (5th Cir. 1979)). The two tests "work in tandem to distinguish suggestive from descriptive marks." *Id.* at 1329.

In concluding that the two marks were not suggestive, the district court relied primarily on the imagination test, reasoning that no imaginative leap is required to cross from WORLDS or THE CHEERLEADING WORLDS to an international cheerleading competition, since "[i]n combination, these words describe a competition where [an] international group of athletes or teams compete in cheerleading."

We agree. Beginning with the simpler of the two marks, WORLDS requires no leap of the imagination to connect its meaning to USASF's product: an international competition. As defined, "Worlds" is a well-worn stand-in for competition labels like "World Competition" or "World Championship," serving as shorthand for a global tournament. *See world*, *n.*, Oxford English Dictionary, https://www.oed.com/dictionary/world_n (last visited May 29, 2026) (defining "Worlds" as "[a] world championship or competition").[2] The term is akin to other words that describe a

---

[2] USASF takes issue with the use of dictionaries to discern a mark's distinctiveness. It asserts that Open Cheer's supplied dictionary definitions "were merely

24-12653                Opinion of the Court                19

geographic competition, such as "Regionals" or "Nationals," which in common parlance are readily evocative of a high-level event in the relevant sport. *See regional, adj. & n.*, Oxford English Dictionary, https://www.oed.com/dictionary/regional_adj (last visited May 29, 2026) (defining "Regionals" as a "regional contest or competition"); *national, adj. & n.*, Oxford English Dictionary, https://www.oed.com/dictionary/national_adj (last visited May 29, 2026) (same for "Nationals"). Although USASF argues that "Worlds" is not defined to mean "a world championship" in the dictionaries cited by the district court, the fact that some dictionaries omit the relevant definition is not dispositive. *See Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1298 n.4 (5th Cir. 1985). And in any event, authoritative dictionaries *do* define "Worlds" to mean "[a] world championship or competition," referring to its capitalized, plural form. *World, n.*, Oxford English Dictionary, https://www.oed.com/dictionary/world_n (last visited May 29, 2026).

---

quoted in an incomplete fashion in their Motion for Summary Judgment" and "no request was made for the Court to take judicial notice of these definitions, and they are not part of the record." We are unpersuaded. "The dictionary definition of [a] word is an appropriate and relevant indication 'of the ordinary significance and meaning of words' to the public," and may be used by a court in the course of assessing a mark's distinctiveness. *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 n.5 (5th Cir. 1974), *abrogated on other grounds, B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138 (2015); *see also Investacorp*, 931 F.2d at 1523–24 ("Also probative of the descriptiveness of a mark is the idea that is conveyed to the observer by the plain dictionary definition of the formatives comprising the mark.").

THE CHEERLEADING WORLDS fares no better.  It is true that in assessing the validity of a mark, "the whole can indeed be greater than the sum of its parts." *Engineered Tax Servs.*, 958 F.3d at 1329 (citing *Vision Ctr.*, 596 F.2d at 116).  We have said that a court must "analyze [a] mark holistically," looking to the specific interplay between the words comprising the mark to discern whether it is suggestive.  *Id.*; *see also USPTO v. Booking.com B.V.*, 591 U.S. 549, 556 (2020) ("[F]or a compound term, the distinctiveness inquiry trains on the term's meaning as a whole, not its parts in isolation.").  That one part of the mark, "Worlds," is not suggestive therefore does not doom the joint phrase "The Cheerleading Worlds" to mere descriptiveness.

Nevertheless, here the phrase "The Cheerleading Worlds," which adds "Cheerleading" as a modifier of "Worlds," does little to add to the imaginative labor required to connect the mark to USASF's product.  USASF argues again that the phrase "The Cheerleading Worlds" is not listed in any dictionary, and thus does not obviously mean "international cheerleading tournament."  But how else would a consumer interpret the phrase?  Although "Worlds" does not precede "Cheerleading," as one might expect for an adjectival descriptor of a competition (e.g., "World Cheerleading Championship" or "World Cheerleading Competition"), a hyper-literal interpretation of "Cheerleading Worlds" describes a nonsensical product: multiple realms within which cheerleading occurs or where cheerleaders otherwise reside, such as in "parallel worlds."  *See world*, *n.*, Oxford English Dictionary, https://www.oed.com/dictionary/world_n (last visited May 29,

2026) (defining "world" as "[t]he state or realm of human existence on earth," or "designating a world other than that of earth," "[a]ny state or realm of existence"); *World*, *n.*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/world (last visited May 29, 2026) (same).

More realistic readings are similarly foreclosed by the plural form of "Worlds." Thus, for example, if the phrase was "The Cheerleading World" or "Cheerleading World," one might analogize to the sport of cheerleading generally, as in "the academic world," *see* *World*, *n.*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/world (last visited May 29, 2026) (alternatively defining "world" to mean "a distinctive class of persons or their sphere of interest or activity"), or a nexus of goods connected to cheerleading, as in "Pet World," a store for pet-related products. But as it stands, the only reasonable, unimaginative reading of "The Cheerleading Worlds" in this context is that of an international cheerleading competition, which is precisely what USASF is intending to evoke.

In asserting that the marks are suggestive, USASF borrows heavily from *Engineered Tax Services v. Scarpello Consulting, Inc.*, 958 F.3d 1323 (11th Cir. 2020). There, we considered whether the mark "Engineered Tax Services" was suggestive, after the district court determined on summary judgment that it was not. *Id.* at 1327. As here, the district court "supported its decision primarily with dictionary definitions of the mark's constituent terms." *Id.* at 1329. On de novo review, we reversed, explaining that the district court

"focused too narrowly on the individual meanings of individual words," and "considered only one sense of the word 'engineer[ ],' to the exclusion of other relevant meanings." *Id.* USASF insists that the district court's analysis in this case was similarly deficient, because it was overly reliant on the individual meanings of constituent terms.

USASF's citation to *Engineered Tax Services* is unpersuasive, since that case is factually and procedurally different. There, the contested trademark was published on the Principal Register, entitling it to a presumption of validity that colored the Court's analysis. *Id.* at 1328. Thus, *the defendant* bore a "double burden" of presenting evidence "so decisive that no reasonable jury could find" that the phrase was inherently distinctive. *Id.* at 1328–29 (citation modified). Of the two marks here, only one (THE CHEERLEADING WORLDS) is registered on the Supplemental Register, and even that would not entitle the mark to the same presumption. *See* 15 U.S.C. § 1094; *George & Co. v. Imagination Entm't Ltd.*, 575 F.3d 383, 391 n.8 (4th Cir. 2009). WORLDS is not registered at all, and so it receives no presumption whatsoever. *See Mil-Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996).

Further, central to the Court's conclusion in *Engineered Tax Services* was its finding that "engineered" was subject to at least two relevant interpretations. The panel observed that the word "engineered" had two similarly plausible readings, so that "when combined with the phrase 'tax services' to form the mark, 'Engineered Tax Services' entail[ed] a clever double meaning, referring to tax

24-12653               Opinion of the Court               23

services that are performed both (1) skillfully and scientifically and (2) by actual engineers." *Engineered Tax Servs.*, 958 F.3d at 1330. Moreover, "the fact that the undeniably descriptive term 'tax services' was modified by the adjective 'engineered' [was] particularly significant because tax services aren't the sort of thing that ordinarily calls for engineering." *Id.* at 1329. The peculiar arrangement of the mark's terms was "more likely to require imagination than would a more natural pairing of words." *Id.*

Here, there is no analogous peculiarity, and no such exercise of the imagination is required to navigate other plausible meanings. "Worlds" is an untethered geographic term that commonly refers to global competitions of any variety. And "The Cheerleading Worlds" adds an expected modifier to this well-known use of the noun "Worlds," so that a consumer readily understands the phrase to refer to an international cheerleading competition. The composite mark is therefore comprised of "a more natural pairing of words," producing a "connection[ ] between product and mark" that is "easy to draw." *Id.* at 1329. Neither mark requires an imaginative leap to discern its referent, and thus the two marks lack the key indicia of suggestiveness as a matter of law.

But there's more. The second test, which the district court did not address, looks to third-party need in describing similar products. *See Investacorp*, 931 F.2d at 1523 (holding if a competitor "need[s]" the mark, it is not distinctive of the mark holder's own product); *see also Engineered Tax Servs.*, 958 F.3d at 1331. If a term is crucial to describing other, analogous products, we are less likely

to deem it suggestive.  USASF argues that there are many other ways to describe an international cheerleading competition that don't involve "Worlds" or "The Cheerleading Worlds."  It asserts that ready synonyms exist, such as "international" or "global," and observes that Open Cheer has considered other competition names that do not use "Worlds" at all.

We are unpersuaded.  That other synonyms exist for a term does not mean that the term is unneeded by third parties.  For instance, "the word 'vision' is virtually indispensable to the vocabulary of the optical goods industry," even though similar words such as "eye, sight, and optics" also exist.  *Vision Ctr.*, 596 F.2d at 116. Similarly, "World" or "Worlds" are terms integral to an international competition, and "The Cheerleading Worlds" is by extension integral to the concept of an international cheerleading competition.  Open Cheer has supplied a plethora of other competitions demonstrating as much, such as "Junior Cheerleading Worlds," "World Cheerleading Championships," and "World Cup of Cheerleading."  USASF itself makes common use of "Worlds" in hosting a different competition: "The Dance Worlds."  As a result, we cannot say that the marks are suggestive, since both are comprised of terms central to naming analogous competitions.

*ii.*

Although the two marks are not suggestive, a reasonable jury still could find that they are descriptive, and not -- as the district court determined -- generic.  "The distinction between descriptive and generic terms is a matter of degree."  *Gift of Learning*, 329 F.3d

24-12653              Opinion of the Court                    25

at 798 (citing *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1548–49 (11th Cir. 1987)). A generic term is usually "the name of a particular genus or class of which an individual article or service is but a member." *Vision Ctr.*, 596 F.2d at 115[3]; *Booking.com B.V.*, 591 U.S. at 556. Further, "a generic name is the term by which the product or service itself is commonly known." *Welding Servs.*, 509 F.3d at 1358 (citation modified) (citing *Nat'l Conf. of Bar Exam'rs v. Multistate Legal Stud.*, 692 F.2d 478, 487 (7th Cir. 1982)).

In the main, a generic term answers only the question "What are you?" instead of "Who are you?" or "Where do you come from?" 2 J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 12.01 (5th ed. 2026). We have offered by way of example that "milk delivery" is generic when used by a milk delivery service, *Investacorp*, 931 F.2d at 1522, "liquor store" is generic "in connection with the sale of liquor," *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999), and "book" is generic for a book store, *Royal Palm Props.*, 950 F.3d at 783. The throughline of these examples is clear: where a mark does no more than "suggest[ ] the basic nature of the product or service," it is generic. *Gift of Learning*, 329 F.3d at 797; *see also Coach House Rest.*, 934 F.2d at 1560 (citing *Am. Television*, 810 F.2d at 1548).

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981. *Id.* at 1209.

The test for whether a term is generic is "the primary significance of the [name] to the relevant public." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1320 (11th Cir. 2012) (quoting 15 U.S.C. § 1064(3)). This inquiry is context-specific, since "[g]enericness lies not in the term itself, but in the use of the term." *Welding Servs.*, 509 F.3d at 1358. That is, "[a] word may be generic of some things and not of others: 'ivory' is generic of elephant tusks but arbitrary as applied to soap." *Id.* (quoting *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980)). Because "the relevant meaning of a term is its meaning to consumers," *Booking.com B.V.*, 591 U.S. at 556, a court may look to "any competent source" of the public's understanding of the term to determine whether it is generic, such as "purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications," *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 1570 (Fed. Cir. 1987).

While the correct classification of USASF's two marks is a difficult question, USASF's evidence of non-generic use renders this fact-bound issue entitled to a jury determination. As the district court acknowledged, USASF has supplied substantial evidence showing that event participants, the media, and other organizations in the domain of competitive cheerleading use "Worlds" and "The Cheerleading Worlds" to refer to USASF's annual event, and not to international cheerleading events more broadly. This evidence includes USASF's marketing materials and promotions, social media posts, Open Cheer's own consistent references to the event, testimony from parents of competitors, and news videos and

article clippings demonstrating that media coverage of the event uses the mark as a source-indicator.

Consider some examples. USASF has supplied social media postings and testimony from event participants, including coaches and cheerleading teams, using "Worlds" or "The Cheerleading Worlds" to refer specifically to USASF's event. One witness, Erin Tyler, testified that when All Star competitors received invitations to Open Cheer's event, the cheerleaders and their parents were excited, because they mistakenly believed they had been invited to USASF's own event -- which Tyler repeatedly referred to as "Worlds." The record also includes at least ten articles written by news publications from across the country, including papers and stations in Idaho, Georgia, Pennsylvania, Wisconsin, California, Virginia, Indiana, Maine, and Texas, all of which refer to USASF's event as either "Worlds" or "The Cheerleading Worlds." Cheerleading-specific publications have likewise used the marks to refer to USASF's event, including in the 2022 edition of Inside Cheerleading magazine. And several of the Individual Appellees themselves have referred to USASF's event as "Worlds" or "Cheerleading Worlds," rather than using those terms in their generic capacity.

At summary judgment, this evidence is probative of the marks being used in a non-generic fashion by the relevant consuming public, i.e., those who compete in All Stars cheerleading or those who watch cheerleading events. And this body of evidence could persuade a reasonable jury that the marks are descriptive. *See, e.g.*, *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1166

(11th Cir. 2019) (finding mark strengthened by plaintiff's use, including "nationwide advertising and promotion"); *Investacorp*, 931 F.2d at 1523 ("To determine whether a term is descriptive, third-party usage by competitors is probative." (citing *Vision Ctr.*, 596 F.2d at 116)); *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 18 (1st Cir. 2008) (looking to media articles, industry use, and plaintiff's use to determine whether "duck tours" was generic); *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 141 (4th Cir. 2001) (same for industry and media use). USASF has presented enough evidence to take the question of whether the marks are descriptive to a jury. *See Edmondson*, 43 F.4th at 1159.

On the other side of the ledger, Open Cheer's evidence is not so conclusive that it forecloses any triable issue of fact as to whether the two marks are generic. Open Cheer primarily relies on dictionary definitions and analogous use by third-party competitors, who have hosted cheerleading events bearing similar names to "Worlds" or "The Cheerleading Worlds." To be sure, "use of a term by competitors in the industry has traditionally been recognized, along with dictionary evidence, as indicating genericness." *Mil-Mar Shoe Co.*, 75 F.3d at 1159 (citations omitted). But the ultimate touchstone of the genericness inquiry is how the relevant consuming public understands the term. *Booking.com B.V.*, 591 U.S. at 557. Although dictionaries and competitor use may be probative of how terms are commonly understood by relevant consumers, USASF has presented evidence that controverts the plain dictionary meaning of "Worlds" and "Cheerleading," showing that to parents, competitors, and the media, the marks are affiliated with

USASF's particular event.  It is not for this Court to decide at summary judgment which bundle of evidence is more compelling; rather, it is for a jury to determine whether the specific evidence proffered by USASF is sufficient to overcome Open Cheer's evidence.

The district court discounted the evidence of non-generic use as to both of USASF's marks, concluding that the evidence "f[ell] short of creating a genuine dispute of material fact."  Basic to this determination was the district court's finding that "until Defendants began their allegedly infringing conduct, Plaintiff's event was the only season-ending world championship event in allstar cheerleading," meaning that "any public association between the Contested Marks and Plaintiff's event is the result of Plaintiff being the sole source of this sort of event."  USASF insists that in so doing, the court erred by improperly weighing the evidence at summary judgment.

As we see it, the district court indeed erred, but not for the reasons USASF offers.  USASF is wrong to characterize the district court's analysis as weighing the evidence.  A party bearing the burden of proof must supply "more than '[e]vidence that is merely colorable, or is not significantly probative'" to survive summary judgment, and so a reviewing court must look to the evidence supplied to determine whether it is colorable and probative. *Fernandez v. Seaboard Marine Ltd.*, 135 F.4th 939, 947 (11th Cir. 2025) (quoting *Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012)).  That is exactly what the district court did here.  It did not "make credibility determinations," *Wade v. McDade*, 106 F.4th 1251, 1264 (11th

Cir. 2024) (en banc) (Jordan, J., concurring), or "consider the relative strength of the parties' evidence," *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1303 (11th Cir. 2018). It instead found that the body of evidence was *per se* irrelevant to the issue of distinctiveness, based on its observation that USASF's event was the only one of its kind.

However, in discarding all of USASF's evidence, we think the court erred for at least two reasons. First, the record strongly suggests that there *were* other season-ending competitions in All Star cheerleading, including "the Summit," held a week after USASF's Championship Week, with which Open Cheer claims its own international event was meant to compete.

But second, and more fundamentally, discarding all of USASF's evidence was erroneous as a matter of law. None of the cases cited by the district court held that evidence of non-generic use ceases to become probative if there is only one relevant product on the market. Our Court has never adopted such a rule. Instead, the cases cited instruct only that where a term has already been found to be generic, some evidence of non-generic use or secondary meaning will not suffice to afford it trademark protection. *See Welding Servs.*, 509 F.3d at 1358; *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986); *Nat'l Conf. of Bar Exam'rs*, 692 F.2d at 487.

These cases do not permit a court to discard evidence in determining whether a term is generic in the first instance. Indeed, as to one of the cases the district court cited, *Surgicenters of America,*

*Inc. v. Med. Dental Surgeries*, *Co.*, 601 F.2d 1011 (9th Cir. 1979), the Ninth Circuit later clarified that its decision did not establish any *per se* test for genericness, stressing that its holding was "based . . . upon detailed information in some 45 exhibits that, taken collectively, suggested that the consuming public considered" the contested mark to be generic. *Filipino Yellow Pages, Inc. v. Asian J. Publ'ns, Inc.*, 198 F.3d 1143, 1148 (9th Cir. 1999); *see also Surgicenters*, 601 F.2d at 1017. And in *Booking.com B.V.*, the Supreme Court rejected the notion that any *per se* rule or unbending legal standard can render a mark generic, instead recounting the "bedrock principle" that the test of genericness is firmly rooted in evidence of consumer perception. 591 U.S. at 557–58, 560–61.

The district court's obligation to consider evidence of non-generic use was not obviated by USASF's event being the first or only one of its kind. Because it wholly discounted the evidence of non-generic use, the court erred by not applying the appropriate test of genericness. Had it considered all of the evidence, it would conclude -- as we do here -- that a reasonable jury could find that the marks are descriptive, since USASF's evidence suggests that the relevant consuming public associates the marks with USASF's event.

### iii.

Just as a jury could find that the marks are descriptive, on the body of evidence presented to the summary judgment court, a jury could also find that the marks have acquired distinctiveness through secondary meaning. For a mark holder to have a

"protectable interest" in a descriptive mark, "[the mark] must have attained secondary meaning before the date that [the alleged infringer] used the similar term." *Investacorp*, 931 F.2d at 1524 (citing *Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985)). In making this showing, a mark holder "has the burden of sustaining a high degree of proof in establishing a secondary meaning for a descriptive term." *Id.* at 1525 (citing *Vision Ctr.*, 596 F.2d at 119). The "requisite high degree of proof must be considered by the court when ruling on a motion of summary judgment." *Id.* (citing *Anderson*, 477 U.S. at 242).

"A mark obtains a secondary meaning -- and therefore acquires distinctiveness -- when, in the minds of the relevant consuming public, the 'primary significance of the term . . . is not the product but the producer.'" *Royal Palm Props.*, 950 F.3d at 784 (footnote omitted) (quoting *Am. Television*, 810 F.2d at 1549). Secondary meaning can be demonstrated "through either direct evidence (like consumer surveys) or circumstantial evidence." *Id.* (citing *Tartell v. S. Fla. Sinus & Allergy Ctr.*, 790 F.3d 1253, 1257 (11th Cir. 2015)). Where, as here, the mark holder has offered no consumer survey, we typically look to the four so-called *Conagra* factors to determine whether a mark has attained secondary meaning:

> (1) [T]he length and manner of [the mark's] use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the [proprietor] to promote a conscious connection in the public's mind between the [mark] and the [proprietor's] product or business; and (4) the extent to which the public actually

> identifies the [mark] with the [proprietor's] product
> or venture.

*Id.* at 785 (quoting *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir. 1984)).  Because the district court held that no reasonable jury could find USASF's marks to be descriptive, it did not consider whether they had attained secondary meaning.  On review, we find the evidence to be sufficient to raise a triable issue on that question.

As for the first *Conagra* factor, the two marks have referred to USASF's competition long before Open Cheer's conflicting use. USASF and its licensees "have engaged in substantially exclusive and continuous use" of the marks since at least 2004, roughly 16 years before Allstar Worlds was created.  USASF's use of the marks during this period was, on the evidence supplied, anything but passive.  *Contra Investacorp*, 931 F.2d at 1525 ("[T]here is nothing significant about the manner of appellant's use of the mark, other than appellant merely 'displayed its service mark on nearly all of its transactional documents.'").  USASF has detailed its substantial advertising and promotional efforts, and for several years spent roughly $150,000 annually to promote the event.  *Contra id.* ("During this period, appellant's advertising expenditures did not exceed one-hundred dollars per month.").

These expenditures have been manifested in a robust social media presence, competition footage uploaded to YouTube, promotional videos, event fliers and competition packets, and livestreaming of the event.  In 2017 alone, the paid livestream of USASF's event garnered 301,595 unique page users, which

increased to 403,615 in 2019.  Similarly, USASF's event has been featured on ESPN and has been broadcasted to hundreds of thousands of viewers.  USASF's efforts demonstrate a concerted attempt to promote a conscious connection between the marks and its event, since USASF's promotional materials make extensive use of the contested marks in relation to Championship Week.

While "evidence of promotion efforts is not sufficient to establish a mark's commercial strength" when viewed "in isolation," in this case USASF has offered evidence of more than just its efforts, detailing consumer engagement with its event and the growth of the event itself.  *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1259 (11th Cir. 2016) (citation modified); *see also Aloe Creme Labs., Inc. v. Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir. 1970).  In fact, USASF's cheerleading event has grown to host "more than 500 teams with more than 10,500 athletes, and another estimated 25,000 spectators each year," up from the original 14 teams in 2004.  And finally, as already discussed, USASF has supplied testimony from eventgoers and news articles from over the years, suggesting that the relevant consuming public associates the two marks with USASF's specific event, rather than with other international cheerleading events.

Open Cheer claims that the evidence of secondary meaning on the record is insufficient.  In addition to offering a boilerplate claim that the evidence is deficient, Open Cheer asserts that much of the evidence supplied by USASF is either undated or dated only *after* Allstar Worlds first emerged during the 2020–2021 season.

Consequently, they insist this evidence fails to establish that secondary meaning for the marks was acquired before Open Cheer began the contested use of a similar mark. To be sure, many of the fliers, social media postings, and emails supplied by USASF are dated during or after 2020. Others are not however, and preceded the creation of Allstar Worlds. The relevant question is whether the evidence supplied could persuade a reasonable jury that the marks had acquired secondary meaning before the 2020-2021 season.

At this stage, a reviewing court must take the evidence supplied in a light most favorable to USASF, and draw all reasonable inferences in its favor. *Tolan*, 572 U.S. at 656–57. Because much of the evidence establishes substantial promotion and engagement with USASF's event bearing the contested marks prior to 2020, USASF has supplied a sufficient body of evidence to survive summary judgment on this point. And beyond the body of evidence that clearly precedes Allstar Worlds, the other evidence dated after 2020 may nevertheless be probative as to the culmination of efforts taken by USASF to build the brand of its event in the years prior. Finally, that some of the evidence is ambiguous as to its date also suggests that the inquiry is fact-intensive in nature, requiring a deep dive into the exhibits to discern which are more probative of the public's association with the marks during the relevant window.[4]

---

[4] Many of the cases cited by Open Cheer affirming a finding of no secondary meaning were procedurally different from this case, since they reviewed findings made only following a bench trial. *See, e.g.*, *Fla. Int'l Univ. Bd. of Trustees*,

Open Cheer separately asserts that despite the record evidence, USASF cannot prove its marks had attained secondary meaning, since USASF is not the sole organizer of Championship Week. Open Cheer claims that because the two marks were used by both USASF and IASF in connection with the event, the mark never "identif[ied] and distinguish[ed] only a single commercial source," pointing to record evidence that bears both companies' logos.

The case law Open Cheer relies on is inapposite. Here, the facts do not involve a mark holder "knowing[ly] acquiesc[ing]" to their competitors' use of the mark, *contra Sandshaker Lounge & Package Store, LLC v. Quietwater Ent. Inc.*, 602 F. App'x 784, 788–89 (11th Cir. 2015) (per curiam); *Campbell Soup Co. v. Armour & Co.*, 81 F. Supp. 114, 120 (E.D. Pa. 1948); a mark so nebulous that it cannot be traced back to any particular source, *contra Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 578 F. Supp. 911, 924 (S.D.N.Y. 1983); or usage split between entities that bear no legal, contractual, or agency relationship to one another, *contra Black Hills Jewelry Mfg. Co. v. LaBelle's*, 489 F. Supp. 754, 762 (D.S.D. 1980), *aff'd*, 633 F.2d 746 (8th Cir. 1980). In this case, the relationship between IASF and USASF is well-established in the record. IASF was a business division of USASF until 2015, and now provides "input on minor issues

830 F.3d at 1251–52 (reviewing decision that was a summary judgment in name, but a bench trial in practice, because the district court reviewed the evidence as a trier of fact); *Am. Television*, 810 F.2d at 1547 (affirming no secondary meaning after bench trial); *Aloe Creme Labs*, 423 F.2d at 847 (same).

in the international divisions of the WORLDS event." IASF assists in running the event, but has no role in handling awards, scoring, or scheduling, and does not retain any proceeds. USASF's representatives have testified that to the extent IASF uses the mark, it does so under an implied license.

Moreover, nothing in the record suggests that the public is confused about which event USASF's marks refer to just because IASF works with USASF. At most, Open Cheer might claim that some eventgoers do not realize that USASF is the event's primary organizer. But this really doesn't matter. "Secondary meaning is the connection in the consumer's mind between the mark and the product's producer, whether that producer is known or unknown." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 n.14 (11th Cir. 1986). USASF's evidence that the relevant consuming public associates the two marks with its *particular* event is probative of secondary meaning, even if some materials also refer to a different licensee.

Since USASF has presented evidence sufficient to persuade a reasonable jury that the marks have obtained secondary meaning, there remains a genuine dispute of material fact as to whether the marks are distinctive. Thus, the entry of summary judgment must be reversed, so the factfinder may determine what protection, if any, USASF's marks are owed.

Similarly, the parties agree that the outcome of the trademark and civil conspiracy claims raised under Florida law follows the same analysis as the federal claims, and so the claims rise or fall together. *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338,

1345 (11th Cir. 2012).  Accordingly, because there is a genuine question of material fact as to the distinctiveness of USASF's marks, the entry of summary judgment for USASF's state claims is likewise reversed, and those claims are remanded to the district court for determination by the factfinder.

## C.

Open Cheer raises several other arguments in the alternative, claiming that even if the marks are distinctive, we ought to affirm the judgment of the district court anyway.  We have said that a district court's judgment may be affirmed "on any ground supported by the record, regardless of whether that ground was relied upon or even considered by the district court." *Kernel Recs.*, 694 F.3d at 1309 (citing, *inter alia*, *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010)).  Nevertheless, neither of Open Cheer's proffered grounds is persuasive.

### i.

First, Open Cheer says that the record evidence is insufficient to establish a likelihood of confusion between "Allstar Worlds" and "The Cheerleading Worlds."  The district court did not reach this issue, since it concluded that the marks were generic.  Because the district court did not consider the matter, we decline to take it up on appeal.

We have said that where an inquiry is "necessarily case and fact specific," a reviewing court should take care in reaching the matter without input from the district court or a competent factfinder.  *Guevara v. Republic of Peru*, 468 F.3d 1289, 1306 (11th Cir.

2006).  This principle finds its roots in the understanding that "where the correctness of the lower court's decision depends upon a determination of fact . . . , the appellate court cannot take the place of the jury."  *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943); *see also Stewart v. Dep't of Health and Human Servs.*, 26 F.3d 115, 115–16 (11th Cir. 1994).  While this principle of restraint is "not a jurisdictional limitation," it is predicated on the pragmatic consideration that fact-intensive questions are better left for initial determination by the factfinder.  *Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1372 n.5 (11th Cir. 1998) (quoting *Ochran v. United States*, 117 F.3d 495, 502 (11th Cir. 1997)).

A mark's likelihood of confusion is generally too case- and fact-specific to take up on a cold record.  If the validity of a plaintiff's mark is established, the question becomes whether there is "a likelihood of confusion in the mind[s] of an appreciable number of reasonably prudent buyers."  *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 979 n.22 (11th Cir. 1983) (citation modified).  To succeed, a mark holder must demonstrate that "the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question."  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004).  We have employed seven fact-intensive factors to analyze the likelihood of confusion: (1) the strength of the plaintiff's mark; (2) the similarity of the marks; (3) the similarity of the products; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the defendant's intent; and (7) the existence and extent of actual confusion in the

consuming public.  *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1255.  The first and last factors are the most important, *see id.*, but all must be considered, *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1207 (11th Cir. 2004).

Whether a likelihood of confusion exists is a question of fact. *Welding Servs.*, 509 F.3d at 1361 (citing *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 840 n.16 (11th Cir. 1983)).  Although we have said that the issue "may be decided as a matter of law," *Tana v. Dantanna's*, 611 F.3d 767, 775 n.7 (11th Cir. 2010), such review has usually occurred *after* the district court or jury has considered the evidence.  *See, e.g.*, *Welding Servs.*, 509 F.3d at 1361 (affirming finding of no likelihood of confusion on summary judgment); *Custom Mfg.*, 508 F.3d at 649 (same); *Tana*, 611 F.3d at 775 (same).  Indeed, we have traditionally remanded where a district court did not properly consider whether a mark is likely to cause confusion.  *See J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 795 (11th Cir. 2020) (reversing and remanding for trial the district court's finding of no confusion, since the district court failed to consider several of the seven relevant factors); *Frostie Co. v. Dr. Pepper Co.*, 341 F.2d 363, 367 (5th Cir. 1965).  We do so again today, since it is wiser to permit the district court to issue a finding of fact it is better situated to make.

ii.

Open Cheer also claims that even if we find the evidence sufficient to take the marks' distinctiveness to a jury, we may affirm at least as to the Individual Appellees, who did not intentionally

misappropriate USASF's marks.  Open Cheer claims that "[i]ndividual owners are only personally liable for an entity's infringement if they 'actively and knowingly caused the infringement,'" and because USASF has not introduced evidence that the non-corporate organizers of Allstar Worlds themselves participated in the infringement, any claims against the Individual Appellees should be dismissed.

We have long held that natural persons may be personally liable for trademark infringement wherever they knowingly and substantially participate in the infringement.  *See, e.g.*, *Edmondson*, 43 F.4th at 1163–64 ("Because corporations are run by individuals, '[n]atural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act.'" (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991))); *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994) (per curiam).  Further, we have instructed that a "corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil."  *Babbit Elecs.*, 38 F.3d at 1184 (citing *Selchow & Righter Co. v. Goldex Corp.*, 612 F. Supp. 19 (S.D. Fla. 1985)).

The Individual Appellees are "former members of USASF" and are the sole owners of the Open Cheer Entities that organize Allstar Worlds and use the allegedly infringing mark.  USASF points to record evidence that the Individual Appellees "substantially participated in the infringement," in that they all discussed

and participated in the selection of the name for their competition, and facilitated the infringing conduct by organizing and promoting the event. The record evidence also suggests that any alleged infringement was done knowingly, since the Individual Appellees acknowledged USASF's trademarks and surmised that USASF may have a problem with the name of Allstar Worlds. Open Cheer points to no evidence to the contrary. *See Babbit Elecs.*, 38 F.3d at 1184.

Moreover, as the sole owners and operators of the entities behind Allstar Worlds, it is unclear how the Individual Appellees would *not* be involved in the marks' usage, and USASF need not pierce the corporate veil to hold the Individual Appellees responsible for their entities' actions. *See id.* A reasonable jury could find on the evidence supplied that the Individual Appellees were personally and substantially involved in the claimed violation. *See Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 23, 23 (5th Cir. 1968). Once more, we remand the matter for a jury to decide.

**REVERSED AND REMANDED**.